Sealed

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.

**15 - 62594**

FILED by _____ D.C.

DEC 1 0 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. – MIAMI

SECURITIES AND EXCHANGE COMMISSION, )
                                         **Plaintiff,** )
                                              )
**v.** )
                                              )
**OXFORD CITY FOOTBALL CLUB, INC.,** )
**THOMAS ANTHONY GUERRIERO,** )
                                              )
                               **Defendants,** )
                                              )
**and** )
                                              )
**GCE WEALTH, INC.,** )
                                              )
                          **Relief Defendant.** )

**JURY TRIAL
DEMANDED**

**SEALED DOCUMENT**

**MAGISTRATE JUDGE
SIMONTON**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges:

### INTRODUCTION

1.     This case involves numerous violations of the antifraud and registration provisions of the Federal securities laws by Defendants Thomas Anthony Guerriero ("Guerriero") and Oxford City Football Club, Inc. ("OXFC;" collectively, "Defendants"), a public company that falsely claims be the "the largest publicly traded diversified portfolio of professional sports teams in the world" and to own a "diversified portfolio of academic institutions."

2.      From at least August 2013 to the present, Defendants, under the guise of OXFC's nominal legitimate businesses, operated a classic "boiler room"[1] out of which they sold millions of shares of illegal unregistered offerings through several fraudulent practices designed to deceive investors concerning the value of the stock they were purchasing and the future profits they could realize.  Defendants further schemed to defraud investors by artificially inflating the value of OXFC stock to induce investment by selling "discounts" from the artificially inflated price, and used deceptive business practices to strong-arm investors into purchasing OXFC stock.  As part of these fraudulent practices, Defendants made numerous misstatements to investors regarding, among other things, OXFC's current assets, its business plan, its future profitability, and the composition of its management.

3.      Over the course of approximately 18 months, Defendants fraudulently raised more than $6.5 million from more than 150 investors who were often unsuspecting, unaccredited, and inexperienced with investing.

4.      Since at least August 2013, Guerriero has been enriched by Defendants' fraudulent offering through the transfer of at least $2.2 million to bank accounts owned by Relief Defendant, GCE Wealth Inc. ("GCE"), which was a company owned and controlled by Guerriero.

5.      Defendants' unlawful solicitations remain ongoing.  The SEC has recently learned that Defendants have continued their unregistered offering, soliciting several investors over the past several months – and as recently as December 8, 2015.

---

[1]      "'Boiler room' activity consists essentially of offering to customers securities of certain issuers in large volume by means of an intensive selling campaign through numerous salesmen by telephone or direct mail, without regard to the suitability to the needs of the customer, in such a manner as to induce a hasty decision to buy the security being offered without disclosure of the material facts about the issuer." *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 874 (S.D. Fla. 1974).

6.      The SEC has also recently learned that Defendants have continued to dissipate investor funds.  In early October 2015, Guerriero orchestrated a series of wire transfers among OXFC and GCE accounts he controlled, including an $83,333 transfer from an OXFC account to a GCE account the day after he appeared for testimony before the SEC and refused to answer questions based upon his Fifth Amendment rights against self-incrimination.  A week later, on October 23, 2015, Guerriero withdrew in cash more than $130,000 in fraudulently obtained funds from a GCE account.  In November 2015, all remaining funds in OXFC's and GCE's known bank accounts were emptied.

7.      As a result of the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) & (c), 77q(a); Section 10(b) the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and Section 20(b) of the Exchange Act, 15 U.S.C § 78t(b).  Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the Federal securities laws.

8.      The Commission, therefore, respectfully requests that this Court enter:  (i) a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Defendants from violating the federal securities laws; (ii) an order freezing the assets of Defendants and Relief Defendant, until further order of the Court; (iii) an order directing Defendants and Relief Defendant to provide a sworn accounting of assets; (iv) an Order requiring Defendants and Relief Defendant to preserve documents; (v) an Order expediting discovery; (vi) an order directing Defendants and Relief Defendant to pay disgorgement with prejudgment interest; (vii) an officer-and-director bar against Guerriero; (viii) a penny-stock bar against Guerriero; and (ix) an order directing Defendants to pay civil money penalties.

## DEFENDANTS AND RELIEF DEFENDANT

9.      **Defendant Guerriero**, age 39, is a resident of Deerfield Beach, Florida.  He was the CEO of OXFC throughout the time period of this Complaint.  At various times between 1998 and 2005, Guerriero held series licenses 7, 24, and 63, as well as a series 66 in 2009.  All of these licenses have expired.  Guerriero worked for twelve years as a registered representative in New York, during which time he was terminated from three brokerage firms.   He also is an author of two self-published books:  "How to Master and Understand Securities Laws and Regulations:  A Manual for Series 66 Success" and "How to Understand and Master the Stock Market:  A Manual for Series 7 Success."  During relevant time period of this Complaint, Guerriero routinely portrayed himself as "world renowned for being one of the most powerful and influential CEO's in the history of Wall Street."

10.     **Defendant OXFC** is a Florida public company with principal offices in Deerfield Beach, Florida.  OXFC was incorporated in Florida on February 11, 2003, as Smart Kids Group, Inc.  After a reverse merger on June 11, 2012, Guerriero became the company's CEO and sole controlling officer, and the company changed its name to WMX Holdings Group, Inc. ("WMX").  On July 8, 2013, the company renamed itself to its present name, "Oxford City Football Club, Inc."  OXFC's common stock is quoted on the OTCBB and the OTC Link using the ticker symbol "OXFC."  Since its inception, Guerriero has controlled all of OXFC's operations, including its communications with investors.

11.     **Relief Defendant GCE** is a Florida company with principal offices in Deerfield Beach, Florida (same as OXFC).  GCE is solely owned and operated by Guerriero.  It has no known business, but has served as the vehicle to which OXFC pays Guerriero's purported

compensation.  Guerriero purportedly earned $3.7 and $5.1 million in executive compensation in 2014 and 2015, respectively, for his role at OXFC.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.  The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act, 15 U.S.C. §77t(d)(2)(C), and Section 21(d)(3)(B)(iii) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3)(B)(iii).  The Commission further seeks an order prohibiting Guerriero from engaging in any offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), and from serving as an officer and director of a public company pursuant to Section 20(e) of the Securities Act, 15 U.S.C. §77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. §78u(d)(2).

13.     The Court has personal jurisdiction over Defendants and Relief Defendant, and venue is proper in this District, because, among other things, Defendants offered or sold securities to investors in this District, and because Defendants and Relief Defendant reside and/or have their principal place of business in this District.

14.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have contacted investors in several States, made use of the means or instrumentalities of interstate commerce, and made use of the means or instruments of transportation or communication in interstate commerce, and of the mails to carry out the unlawful conduct described in this Complaint.

<u>**DEFENDANTS' UNLAWFUL CONDUCT**</u>

**I.    <u>The Foundations of Defendants' Unlawful Conduct</u>**

15.    In late 2012, Guerriero was operating a publicly traded company called WMX.  It offered an Executive Training Certificate in Financial Planning.   In the second quarter of 2012, WMX had revenue under $50,000, and a net loss of $716,624.

16.    By April 2013, WMX stock was trading at less than $0.01 per share.  On March 21, 2013, WMX executed a 1-for-4000 reverse stock split.  Around that time, OXFC had acquired 49 percent of a British entity, Oxford City Football Club (Trading) Ltd. ("Oxford Trading"), an entity that operated Oxford City Football Club located in Oxford, England. Guerriero acquired one percent of Oxford Trading, and a British charitable organization owned the remaining 50 percent.

17.    On July 8, 2013, WMX changed its name to OXFC.  At the time, it claimed to have "two core portfolio divisions."  First, OXFC purportedly had a "Professional Sports Portfolio," which consisted of two soccer teams, the Oxford City Football Club, and the Oxford City Nomads, that compete in lower divisions of the English Football Association.  OXFC also owns, or has owned at various times, a number of semi-pro indoor and outdoor soccer teams, as well as a basketball team.  According to OXFC's public filings, none of these teams have generated profits for OXFC.

18.    Second, OXFC purportedly had an "Academic Institution Portfolio Division" that consisted of two schools:  Oxford City University in the United States, which purported to offer Bachelors, Masters, and Doctoral degree programs in economics and financial markets, and the Oxford City Sports College in the United Kingdom, which "thrive[d] to provide its student-athletes a comprehensive year-round curriculum" that included education and football training.

19.     Throughout the relevant period, OXFC gave the United States school several names, including Oxford City University, CIT University, City Institute of Technology and Christian Institute of Technology.  It purported to be primarily an online university that also had plans to establish physical space.  OXFC's public filings with the SEC have never reported revenue attributable to any schools.

20.     In addition, at various times the company also purported to have a Media and Entertainment Portfolio that included a South Florida radio station and a real estate and property management portfolio.

21.     Over the relevant period, OXFC often sold itself "the largest publicly traded diversified portfolio of professional sports teams in the world" that also owns, among other things, a "diversified portfolio of academic institutions."  OXFC has not, however, generated revenue other than the nominal revenue – and zero profit – from its two English soccer teams.

22.     By the end of its first full fiscal year after it name changed to OXFC, for example, which ended June 30, 2014, OXFC reported $622,522 in revenue, and a net loss of more than $7 million.

23.     These operations served as the foundation for Defendants' fraud, providing some level of legitimacy to OXFC such that Defendants were able to induce millions-of-dollars of investment in OXFC through unregistered, fraudulent means.

24.     Throughout the relevant period, Guerriero has controlled all aspects of OXFC's operations, including its solicitations of potential investors.

**II.     Defendants' Unregistered Direct Offerings Of OXFC Stock Through The Boiler Room And Other Means**

25.     On March 21, 2013, OXFC (then called WMX) executed a 1-for-4000 reverse stock split.  Prior to the split, WMX traded for less than a penny per share.  On May 3, 2013,

Guerriero became the first person to purchase the stock post-split when he bought 100 shares of WMX at $6.48 per share.

26.    Beginning in or around August 2013, following the name change from WMX to OXFC, Guerriero set up and managed a call center in OXFC's headquarters in Deerfield Beach, Florida, to sell OXFC stock to the general public using a classic boiler room-style operation.

27.    Guerriero enlisted a recidivist fraudster and other salesmen experienced in high-pressure sales tactics to assist him in the scam. The sales team was hired as purported "consultants" and paid on commissions that totaled as much as 15-20% of all sales. None of these fees were disclosed to investors. In fact, Guerriero instructed boiler room salesmen to tell investors who inquired that the salesmen were salaried employees of the company that received no commissions.

28.    Throughout the relevant period, Guerriero controlled and managed OXFC's boiler room operations. Among other things, Guerriero trained the sales force, created written scripts for them to follow on calls, and monitored sales calls to develop methods to enhance the boiler room's effectiveness. Guerriero was also directly involved in OXFC's unregistered offerings by soliciting investors, often when boiler room salesmen would forward calls to Guerriero for Guerriero to act as the sales "closer."

29.    Pursuant to Guerriero's instruction, the boiler room salesmen would seek to induce investment using deceptive sales tactics, schemes to defraud investors, and fraudulent representations of the value and future profit potential of OXFC, as otherwise described in this Complaint.

30.    The boiler room contacted potential investors using numerous lead lists purchased from third parties. As part of their sales pitch, they made no effort to inquire into financial

background or investing experience of potential investors. Furthermore, the boiler room salesmen masked their identities by using aliases.

31.     Throughout the relevant period, there was no registration statement filed with the SEC, nor was there a registration statement in effect, for Defendants' sales of OXFC shares.

32.     In its publicly filed annual reports, OXFC claimed an exemption from registration pursuant to Rule 506 of SEC Regulation D, 17 C.F.R. § 230.506 and claimed they "did not engage in any general solicitation or advertising." Defendants, however, did not satisfy this exemption because they engaged in a general sales solicitation effort that involved making cold-calls to thousands of prospective investors using numerous lead lists purchased from third parties.

33.     Defendants did not vet potential investors for "accredited" status. They did not ask questions concerning the investors' sophistication or financial holdings, nor did they ask for documentation confirming such status. Instead, Defendants solicited many unsophisticated investors that did not possess the experience, income, or assets to qualify as accredited investors.

34.     Guerriero also made several attempts to conceal the fact that he was selling unregistered shares to non-accredited investors. Although he made no attempt, either prior to making cold calls or when speaking to investors, to determine if the individuals he targeted were, in fact accredited investors, Guerriero attempted to create a *post hoc* record of their qualifications.

35.     Following their agreement to purchase shares, Defendants sent certain investors three pages of a Subscription Agreement signature pages in which they were supposed to attest to their "accredited" status. The necessary boxes indicating that the investors were accredited based on income and assets had already been checked by Guerriero or others at this direction,

and the investors were simply asked to sign the pages and send them back.  Those signature pages were then inserted into the full Subscription Agreement signature pages by OXFC.  In other cases, Guerriero or others at his directly simply forged the signature pages altogether.

36.     In addition, during the time period of these share issuances, OXFC stock qualified as a "penny stock" because it was an equity security that traded under $5 per share during the relevant period, and did not qualify for any of the listed exemptions in Exchange Act Rule 3a51-1.

37.     Through use of the boiler room and otherwise, from at least August 2013 through the present, Defendants sold millions of shares of OXFC stock through direct offerings to more than 150 investors in over 30 states using the phone, email, and the mail, generating proceeds of more than $6.5 million.

### III.     Defendants' Fraudulent Offerings of OXFC Stock

38.     Defendants also violated the Federal securities laws by selling OXFC via numerous material misrepresentations of fact and schemes to defraud investors.

#### A.     Defendants' Scheme To Artificially Inflate The Price of OXFC Stock

39.     Critical to Defendants' sales pitch was their claim that OXFC was conducting direct offerings at a significant discount from the stock's publicly quoted price, and that its offering was only for a limited time.   Typically, Defendants were offering OXFC stock at about $1 to $2 per share, when its publicly quoted price was in the range of $4 to $6 per share.

40.     What Defendants failed to inform investors, however, was that Defendants had schemed to artificially inflate OXFC's publicly quoted sales price to further their sales pitch. During the relevant period, OXFC's stock was thinly traded on the OTC markets, and, to prop up the price, Defendants enlisted several individuals to purchase enough stock to maintain a

sufficient price level such that Defendants could pitch a discount that would seem attractive to investors.

41.     Defendants' sole purpose in facilitating these trades was to scheme to defraud potential investors by giving the appearance that they were purchasing a stock at a "discount" when, in fact, OXFC's quoted price at the time was artificially inflated by Defendants' scheme. Defendants further knew that their direct offerings would be subject to holding periods that prohibited investors from selling the stock for at least a year, thereby exposing the investors to a drastic decline in the publicly quoted price once Defendants' efforts to artificially inflate OXFC's stock ceased.

42.     Indeed, by 2015, OXFC's stock price had crashed to less than $0.01 per share.

43.     Defendants recently affected another reverse stock split in August 2015, this time at 1:2000, to again inflate its price.  As of December 8, 2015, OXFC stock is trading around $10 per share, but that price is thousands of times less than its height before the reverse stock split, which resulted in massive potential losses for OXFC's investors.

**B.     Defendants' Unlawful Strong-Arm Sales Tactics**

44.     Defendants also coerced numerous individuals to purchase OXFC stock by tricking them into thinking that they had already agreed to purchase the shares when they had not.  Throughout the relevant period, Defendants engaged in a scheme to defraud by obtaining investors' personal information over the telephone, such as a date of birth and Social Security number, while pressing buttons on their telephone to give the appearance of the use of a recording device.

45.     After the "recording," Defendants would send investors written confirmation of a claimed "purchase" of OXFC shares that set a due date for payment.  Defendants further claimed

that the purchase was recorded on a "Verbal Verification System"[2] that linked their personal information with the purchase via a filing with the SEC.

46.     If a potential investor disputed the transaction, Defendants falsely claimed that the Verbal Verification System was legally binding, and that if they failed to purchase the stock, they faced collections actions, law suits, liens, late fees, and impairment of their credit rating.

47.     For instance, Defendants contacted by telephone one investor, a high school graduate who earns approximately $1,200 per month and had no savings or investments to speak of, to offer him an opportunity to buy OXFC stock at a discounted price.  Defendants told this investor that he had to act fast as the alleged discount window on the stock price was closing. The investor did not agree to purchase OXFC shares.  Rather, he simply agreed to "lock in" the offer at the discounted price as a result of Guerriero's aggressive sales pitch.  After receiving his confirmation email, the investor responded by thanking Guerriero for the opportunity, but declined the offer.  Guerriero, however, told the investor that the transaction was already consummated, irreversible, and "linked to his social security number."  Guerriero further told the investor that he would face late fees, collection costs, and liens on his property if he failed to pay.  The investor, believing Guerriero's threats that he owed OXFC $50,000 and would face lawsuits and financial ruin if he refused to pay, borrowed $50,000 from his sister to satisfy the "debt."

48.     Another investor, a 79-year-old widow who Guerriero sought to deceive into liquidating her retirement annuity to invest in OXFC, received the following email from Guerriero when she decided the next day to not invest:

---

[2]      Throughout the relevant period, Defendants gave this purported "Verbal Verification System" several names, including the "International Banking Verbal Verification System."

You are responsible to satisfy your legal and binding commitment. If I do not hear from you *Today November 8th, 2013* I will turn this over to our legal/collections department at 5:01PM who are experts and have a history of collecting every single dollar that is owed to us, plus all legal, all collection costs, and a tremendous amount of damages.

I will be seeking damages in excess of $10 million against you and your trust for the health related issues that I have dealt with due to the stress of dealing directly with you in regards to this matter. You have continually lied, continually misrepresented your intentions, and have purposefully caused me irreparable harm in defaulting on your legal obligations in this transaction.

49.     Defendants had no "legal/collections department" and no history of collecting on such alleged debts.

50.     Five days later, the widow had a heart attack that she attributes to the stress Defendants placed on her, and soon thereafter, liquidated a substantial portion of her stable annuity and gave Defendants $250,000.

51.     Numerous other investors have faced similar deceptive sales practices from Defendants throughout the relevant period, whereby Defendants attempted to coerce investment in OXFC through misrepresentations and false threats of collection actions, lawsuits, liens, and similar actions.

52.     This conduct constituted a deceptive business practice intended to induce investment in OXFC. Defendants knowingly misrepresented that investors had agreed to purchase OXFC stock, when they had not, and that the Verbal Verification System locked them into a purchase. Thus, Defendants knowingly lied to investors both about the existence of a Verbal Verification System, its alleged link to the SEC, and that investors had agreed to purchase OXFC stock.

53.     Defendants' misrepresentations were material to investors and convinced numerous individuals to invest in OXFC who otherwise would have declined.

54.     Defendants' conduct also constituted a scheme to defraud investors, through a pattern and practice of using false claims of the existence of a Verbal Verification System and other deceptive strong-arm sales tactics to coerce investment in OXFC.

55.     Guerriero also has taken steps to hide Defendants' unlawful conduct.  When Guerriero learned that an investor had spoken with individuals at the SEC and had expressed concerns about OXFC, Guerriero called the investor and coerced him into leaving a staged voice mail on Guerriero's phone – using a script prepared by Guerriero – where the investor apologized for causing any trouble, stated that his complaints to the SEC were unfounded, and confirmed that he was comfortable with his investment.  Guerriero even ordered this individual to make a second voicemail because he thought the first staged voicemail left by the investor was inadequate to fully cover Guerriero's tracks.

**C.      Defendants' Material Misrepresentations and Omissions Concerning OXFC's Value and Future Profitability**

56.     To further entice unsuspecting investors to purchase the unregistered securities, Defendants made numerous material misstatements and omissions to investors regarding OXFC's current and future value.

**i.      The Boiler Room Salesmen's And Guerriero's Material Misrepresentations Concerning OXFC's Value and Future Profitability**

57.     Guerriero instructed OXFC's boiler room salesmen to tell potential investors that OXFC:  (1) had large real estate holdings worth about $100 million and (2) owned an online university with students currently enrolled.   At Guerriero's direction, OXFC's boiler room salesman made such statements to investors during sales calls.

58.     These statements were false, and Defendants knew it.  OXFC never had real estate holdings worth anywhere near $100 million, nor did it ever have a paying student in its online university.  Guerriero, as CEO of OXFC, knew of its business operations, as further demonstrated by his certification of OXFC's public filings that did not reflect the inflated revenues or assets that Defendants described to investors.

59.     OXFC's boiler room salesmen and Guerriero also made misleading and unfounded statements that OXFC:  (1) was going to pay dividends of $0.50 per share within a year or less; and (2) would soon be listed on the New York Stock Exchange ("NYSE").  In at least two instances, Guerriero gave investors a specific date on which OXFC would pay a dividend, and in at least one case, Guerriero told the investor that the Board of Directors had already "approved" the dividend.  Guerriero also told one investor that OXFC should be listed on the NYSE by the first quarter of 2015.

60.     All of these statements were false and misleading, and Defendants knew it.  Even according to its own 10-K, OXFC has never been financially able to pay a dividend, let alone a $0.50 per share dividend in the first year that investors owned the stock.  In fact, the company lost $9.1 million and $3.7 million for the fiscal years ending 2014 and 2013.  With such losses, state law prohibited OXFC from issuing a dividend, as OXFC acknowledged in public SEC filings made after at the misrepresentations were made to investors.  Oxford City also disclosed in its filings that it had "not declared any dividends and we do not plan to declare any dividends in the foreseeable future."

61.     Likewise, the company has never been close to meeting the qualifications to list on the NYSE.  For example, to list on the NYSE, OXFC's publicly held shares would have to have an aggregate market value of $40,000,000.  Although OXFC's market cap occasionally

exceeded that amount due to its artificially high stock price, the NYSE rules require companies to subtract from their market cap any shares held by company insiders, which would have put OXFC well below the $40,000,000 threshold.  The NYSE rules also set minimum requirements on earnings from continuing operations that Oxford City had no plausible way of meeting.

62.     These statements were also material because they falsely gave the impression that OXFC stock had future value for investors, which would influence them to invest in OXFC.

### 2.     Defendants' Fraudulent "Business Plans" And Guerriero's Supporting Misrepresentations

63.     Defendants further misled investors and prospective investors during the relevant period through several false and misleading "Business Plans" that they provided to investors and potential investors.

64.     Guerriero created and/or instructed OXFC employees as to the statements made in OXFC's Business Plans, and had the ultimate authority over all statements contained therein before they were sent to investors.

65.     OXFC's Business Plans were rife with material misrepresentations.  For example, in one Business Plan sent to investors in late 2013, Defendants claim to own a broadcasting network called the Oxford City Broadcast Network ("OCBN").  The OCBN was touted in OXFC's Business Plan as a "state-of-the-art production facility … capable of handling most commercial delivery systems," that boasts a radio signal on AM 740 that is "one of the strongest in the state of Florida."  It projected profits for OCBN of $3.9 million in its first year, and almost $20 million over five years.

66.     Furthermore, in or around August 2013, Guerriero discussed OCBN with at least one investor, and he claimed that OXFC "purchased," "owned" and "acquired" a broadcasting network.

67.     These statements were false, and Defendants knew it.  At the time, OXFC had only a six-month contract with a real broadcasting network to permit OXFC to broadcast for 1 hour per week.  It had no revenue streams.   Rather, Defendants used the hour as a platform for Guerriero tout himself as an up-and-coming entrepreneur and OXFC as an attractive investment opportunity.  There was no reasonable basis for Defendants to project multi-million profits within one year, and Defendants did not genuinely believe that OXFC would obtain such profits.

68.     Defendants also misled investors about the success and profitability of Oxford City University, the purported online college in the U.S. and the cornerstone of OXFC's "Academic Portfolio."  OXFC Business Plans that were sent to investors over the relevant period projected profits from its universities of *$495 million in profit* over a five-year span.

69.     In an email to one investor, Guerriero elaborated:

> We anticipate in 5 years to get to over 15,000 students. This would
> bring our revenue to over $150 Million.  We anticipate operating at
> a 90% profit, which is $135 million per year.  So by Year 5 we
> anticipate generating over $500 million in net profit.

70.     OXFC has no track record of profits from any academic programs during its existence.  In fact, over the relevant period, OXFC's public filings never reported *any* revenue from any academic institution.  Yet Defendants were projecting profits that would have made it one of the largest, if not the largest, for-profit university in the United States.

71.     Defendants' Business Plans contained several other fraudulent profit projections. The projected profits included earning approximately an additional *$240 million* in five years from the following sources:

- $7.4 million from "Our Existing Indoor Arena"

- $7.6 million from "Our Existing Oxford City FC Stadium"

- $21.9 million from "10 New Indoor Oxford City FC Academy & Sports Rental Facilities"

- $71.3 million from the "New Oxford City FC Stadium"

- $38.1 million from the "New Oxford City FC Facility"

- $30 million from the "New Oxford City Clubhouse & Convention Center"

- $31.1 million from the "New Oxford City Futsal Arena"

- $31.1 million from the "New Oxford City Basketball Arena"

72.     Defendants also claimed in Business Plans that OXFC would generate $19 million of profit from the "CIT University Think Tank," which was purportedly an incubator for entrepreneurial ideas coming from the University's student body.  No such entity existed.

73.     All told, OXFC's Business Plan projected about *$777 million in profit in five years.*

74.     Defendants fraudulently made these profit projections.  At the time they were made, OXFC had only nominal revenue from its 49 percent interest in an English soccer club.  According to its own 10-Ks (many of which were filed after Defendants made the foregoing misrepresentations), OXFC's total operations sustained comprehensive losses of approximately $7.4 million, $9.1 million, and $3.7 million for the fiscal years ending 2015, 2014, and 2013, respectively, and had an accumulated deficit of $21.5 million as of June 30, 2015.

75.     Although the English soccer club, which owned a small facility and a number of semi-pro indoor and outdoor soccer teams, reported some revenue, it never turned a profit since OXFC became a minority owner.  In total, from 2013-2015, OXFC's football division had generated average annual gross revenues of only $431,032 with no profits.

76.     Defendants therefore did not reasonably or genuinely make any of these profit projections.

77.     All of these profit projections were material to investors because they directly reflected OXFC's future value, which influenced investors to purchase OXFC stock.

78.     In addition, in a Business Plan that Guerriero sent to investors on or around December 2013, Defendants extolled the value of OXFC's stock, stating it was "undervalued," has a "book value of $38 per share" and "should be trading at 5-6 times book value" or "over $224 per share."  Defendants also boasted that "institutional firms had collectively accumulated over 88% of the company, making it very stable and secure."  Finally, the document described OXFC as a "131-year-old debt-free, diversified holding company that has been featured in the Wall Street Journal, New York Times, CNBC, and countless periodicals."

79.     Guerriero repeated the misrepresentation that OXFC was a 131 year-old debt-free company to multiple investors on the phone and in at least one email.

80.     All of these statements were false, and Defendants knew it.  OXFC has not generated a single dollar in profits since it was created.  The small amount of revenue OXFC generates from its 49 percent ownership of the U.K. football club (from legitimate ticket sales, concessions, facilities rentals, and other activities) is eclipsed by OXFC's expenses and Guerriero's compensation.  Furthermore, although the UK soccer club was 131 years old, Guerriero's holding company was formed in 2013 and, in fact, had significant debt.

81.     Guerriero also misled investors about OXFC's management on numerous occasions.  In marketing materials and press releases, Guerriero claimed to have a large and diverse "Advisory Board" that assisted him in the management of OXFC.  Most of these alleged advisors were accomplished individuals, respected in fields such as education, sports, and

medicine.  One name that Guerriero touted in almost all of OXFC's marketing materials is Brandon Steiner, a media personality who appears occasionally on television news and sports channels with famous athletes or commentators.  In OXFC marketing materials, Guerriero presents Steiner prominently as a member of his Advisory Board.  In one document, Steiner and Guerriero are listed alone under the heading "Key Board Members," followed by pictures and bios of the two men.

82.     These statements were false and misleading, and Defendants knew it.  While Steiner may have been contacted by Guerriero on one or two occasions and agreed to offer some advice, he was unaware of Guerriero's representation, was not involved with OXFC management, and received no compensation from the Company.  Guerriero also touts Dr. Larry Fenn and Dr. Richard Sherza, two accomplished individuals in academia, as being part of the "Management Team" of his online university.  Neither of these individuals were part of Guerriero's management team,  had any involvement with Mr. Guerriero, or knew anything about OXFC or its purported online university.

83.     These misrepresentations were material.  Investors were influenced to invest by OXFC's association with prominent business members such as Steiner.

IV.     **Defendants' Recent Unlawful Solicitations And Asset Dissipation**

84.     Defendants continue to solicit investors for unregistered offerings using likely fraudulent means.  The SEC has recently learned that Defendants have continued to solicit unaccredited investors over the past few months – and as recently as December 8, 2015.  In some instances, Guerriero again overstated OXFC's profit potential and assets, and used similar deceptive sales tactics to induce investment as otherwise described in this Complaint.

85.     Defendants have also recently dissipated investor funds.  In early October 2015, Guerriero orchestrated a series of wire transfers among OXFC and GCE accounts he controlled, including a large transfer from the OXFC account to GCE the day after he appeared for testimony before the SEC and refused to answer questions based upon his Fifth Amendment rights against self-incrimination.  A week later, on October 23, 2015, Guerriero withdrew more than $130,000 in cash from a GCE account.  Guerriero withdrew an additional $16,682 in cash on November 4, 2015 and spent over $4,000 on corporate debit cars.  As of November 30, 2015, all of the GCE and OXFC corporate accounts had zero or negative balances.

86.     Based on the sale of thousands of shares of unregistered securities, numerous misrepresentations and omissions to investors to induce investment in OXFC, coercive sales tactics, several schemes to defraud, and the likely movement of investor assets overseas, emergency relief is needed to stop the sale of unregistered securities and Defendant's coercive sales tactics, preserve any funds presently in the Defendants' accounts that have been obtained from the sale of unregistered securities, obtain an immediate accounting of investor funds, and preserve documents regarding the company and its operations.  Indeed, unless restrained and enjoined, Defendants are reasonably likely to continue to violate the Federal securities laws through their currently ongoing operations and cause further investor harm.

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

**(Against all Defendants)**

87.     The Commission realleges and incorporates by reference paragraphs 1 through 86 above.

88.     By engaging in unregistered sales of OXFC stock, Defendants, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

89.     No registration statement has been filed with the Commission or has been in effect with respect to any of the sales alleged above.

90.     No exemption applied to Defendants' unregistered offerings.

91.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined will to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act

**(Against All Defendants)**

92.     The Commission repeats and realleges Paragraphs 1 through 86 of its Complaint.

93.     From at least August 2013 to the present, Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

94.     Among other things, Defendants knowingly made numerous material misrepresentations to scheme to defraud investors to invest, employed deceptive strong-arm sales tactics to defraud investors, and further schemed to defraud investors by artificially inflating OXFC's stock price to facilitate Defendants' sales.

95.     By reason of the foregoing, Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud in Violation of Section 17(a)(2) of the Securities Act

### (Against All Defendants)

96. The Commission repeats and realleges Paragraphs 1 through 86 of its Complaint.

97. From no later than August 2013 to the present, Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint, obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

98. By reason of the foregoing, Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT IV

### Fraud in Violation of Section 17(a)(3) of the Securities Act

### (Against All Defendants)

99. The Commission repeats and realleges Paragraphs 1 through 85 of its Complaint.

100.    From no later than August 2013 to the present, Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint,

engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

101.     Among other things, Defendants knowingly made numerous material misrepresentations to scheme to defraud investors to invest, employed deceptive strong-arm sales tactics to defraud investors, and further schemed to defraud investors by artificially inflating OXFC's stock price to facilitate Defendants' sales.

102.     By reason of the foregoing, Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

### (Against All Defendants)

103.     The Commission repeats and realleges Paragraphs 1 through 85 of its Complaint.

104.     From no later than August 2013 to the present, Defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the purchase or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

105.     Among other things, Defendants knowingly made numerous material misrepresentations to scheme to defraud investors to invest, employed deceptive strong-arm sales tactics to defraud investors, and further schemed to defraud investors by artificially inflating OXFC's stock price to facilitate Defendants' sales.

106.    By reason of the foregoing, Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

## COUNT VI

### Fraud in Violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (Against All Defendants)

107.    The Commission repeats and realleges Paragraphs 1 through 85 of its Complaint.

108.    From no later than August 2013 to the present, Defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the purchase or sale of securities, as described in this Complaint, knowingly, willfully or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

109.    By reason of the foregoing, Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

## COUNT VII

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

### (Against All Defendants)

110.    The Commission repeats and realleges Paragraphs 1 through 85 of its Complaint.

111.    From no later than August 2013 to the present, Defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the purchase or sale of securities, as described in this Complaint, knowingly, willfully or

recklessly engaged in acts, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

112.    Among other things, Defendants knowingly made numerous material misrepresentations to scheme to defraud investors to invest, employed deceptive strong-arm sales tactics to defraud investors, and further schemed to defraud investors by artificially inflating OXFC's stock price to facilitate Defendants' sales.

113.    By reason of the foregoing, Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

## COUNT VIII

### Fraud in Violation of Section 20(b) of the Exchange Act

#### (Against Defendant Guerriero)

114.    The Commission repeats and realleges Paragraphs 1 through 85 of its Complaint.

115.    Guerriero, directly or indirectly, committed acts through third parties, including the boiler room salesmen who made numerous material misrepresentations and individuals who purchased OXFC stock for the purpose of artificially increasing its price at Guerriero's direction, as described above, all of which constituted violations of the Federal securities laws as described in this Complaint.

116.    By reason of the foregoing, Guerriero violated, and unless enjoined, is reasonably likely to continue to violate Section 20(b) of the Exchange Act, 15 U.S.C. § 78t(b).

## COUNT IX

### Unjust Enrichment

### (Against Relief Defendant GCE)

117.    The Commission repeats and re-alleges Paragraphs 1 through 85 of the Complaint as if fully set forth herein.

118.    GCE received funds and property from one or more of the Defendants, which are the proceeds, or are traceable to the proceeds, of the unlawful activities of the Defendants, as alleged in paragraphs 1 through 85 above.  Relief Defendant had no legitimate claim to receive these funds.

119.    GCE obtained the funds and property alleged above as part of and in furtherance of the securities violations alleged in Paragraphs 1 through 85 above and under circumstances in which it is not just, equitable or conscionable for them to retain the funds and property.  As a consequence, GCE was unjustly enriched.

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

### I.

### Temporary Restraining Order, Preliminary Injunction and Permanent Injunction

Issue a Temporary Restraining Order, Preliminary Injunction and Permanent Injunction, restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the Federal securities laws alleged in this Complaint.

- 27 -

## II.

### Asset Freeze

Issue an Order freezing the assets of Defendants and Relief Defendant, until further Order of the Court.

## III.

### Enjoining Securities Solicitations

Issue an Order prohibiting Guerriero from directly or indirectly, including, but not limited to, through any entity owned or controlled by Guerriero, participating in the issuance, purchase, offer, or sale of any security, provided, however that such order shall not prevent Guerriero from purchasing or selling securities listed on a national securities exchange for his own personal accounts.

## IV.

### Sworn Accounting

Issue an Order directing Defendants and Relief Defendant to provide a sworn accounting of all proceeds received resulting from the acts or courses of conduct alleged in this Complaint.

## V.

### Records Preservation

Issue an Order restraining and enjoining Defendants and Relief Defendant, their directors, officers, agents, servants, employees, attorneys, depositories, banks, and those persons in active concert or participation with any one or more of them, and each of them, from, directly or indirectly, destroying, mutilating, concealing, altering, disposing of, or otherwise rendering illegible in any manner, any of the books, records, documents, correspondence, brochures, manuals, papers, ledgers, accounts, statements, obligations, files and other property of or

pertaining to Defendants and Relief Defendant wherever located and in whatever form,

electronic or otherwise, that refer, reflect or relate to the acts or courses of conduct alleged in this

Complaint, until further Order of this Court.

## VI.

### Expedited Discovery

Issue an Order expediting discovery for the Commission to take in the period between

issuance of a temporary restraining order and preliminary injunction.

## VII.

### Disgorgement

Issue an Order directing Defendants and Relief Defendant to disgorge all ill-gotten gains,

including prejudgment interest, resulting from the acts or courses of conduct alleged in this

Complaint.

## VIII.

### Penalties

Issue an Order directing Defendants to pay civil money penalties pursuant to Section

20(d) of the Securities Act, 15 U.S.C. § 77t(d); and Section 21(d) of the Exchange Act, 15

U.S.C. § 78u(d).

## IX.

### Penny Stock Bar

Bar Defendants from any future participation in the offering of any penny stock bar, as

defined by Section 3(a)(51)(A) of the Exchange Act, 15 U.S.C. § 78c(a)(51)(A) and Rule 3a51-1

thereunder, 17 C.F.R. § 240.3a51-1, including engaging in activities with a broker, dealer, or

issuer for purposes of issuing, trading or inducing or attempting to induce the purchase or sale of

any penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section

21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), and the Court's equitable powers;

## X.

### Officer and Director Bar

Bar Guerriero, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. §77t(e), and

Section 21(d)(2) of the Exchange Act, 15 U.S.C. §78u(d)(2). from serving as an officer or

director of any entity having a class of securities registered with the Commission pursuant to

Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to

Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d);

## XI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## XII.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this

action in order to implement and carry out the terms of all orders and decrees that may hereby be

entered, or to entertain any suitable application or motion by the Commission for additional

relief within the jurisdiction of this Court.

### DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.

Dated:  December 10, 2015

Respectfully submitted,

By:

_____
Matthew F. Scarlato
Special Bar No. A5502152
Dean M. Conway
D.C. Bar No. 457433
SECURITIES AND EXCHANGE
 COMMISSION
100 F Street, NE
Washington, DC  20549
Tel:  (202) 551-3749 (Scarlato)
Fax:  (202) 772-9245
E-mail:  scarlatom@sec.gov


Of Counsel:

    Scott W. Friestad
    Brian O. Quinn
    Darren E. Long
    Brian D. Vann
    SECURITIES AND EXCHANGE
     COMMISSION
    100 F Street, NE
    Washington D.C. 20549